* * * * * * * * * * *
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Stanback. The appealing parties have shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Stanback with modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. All parties are correctly before the Commission, and there is no question as to misjoinder or nonjoinder of parties. The Commission has jurisdiction over the parties and the subject matter.
3. An employment relationship existed between employee-plaintiff and employer-defendant on May 21, 2001, the date of injury.
4. Brentwood Services Administrators, Inc. was the carrier on the risk.
5. Employee-plaintiff sustained a compensable injury to her low back and left hip on or about May 21, 2001.
6. Employee-plaintiff's average weekly wage was $692.00, yielding a compensation rate of $461.36.
7. Defendants paid temporary total disability benefits from June 20, 2001 through October 15, 2003. Defendants also provided medical and vocational rehabilitation benefits to employee-plaintiff. Rehabilitation Professionals Trudy Castlebury and Mary O'Neill have provided rehabilitation services to employee-plaintiff at the request of defendants.
8. The Industrial Commission approved a Form 24 on October 15, 2003 and suspended employee-plaintiff's right to collect temporary total disability benefits effective August 22, 2003.
9. Documents stipulated into evidence include the following:
a. Stipulated Exhibit #1 — Pre-Trial Agreement
 b. Stipulated Exhibit #2 — Industrial Commission Forms and Filings
 c. Stipulated Exhibit #3 — Plaintiff's medical records
d. Stipulated Exhibit #4 — Physical therapy records
 e. Stipulated Exhibit #5 — Medical rehabilitation records
 f. Stipulated Exhibit #6 — Vocational rehabilitation records
 g. Stipulated Exhibit #7 — Discovery index — Plaintiff's and Defendants' Responses
 h. Stipulated Exhibit #8 — Information regarding benefits to plaintiff
 * * * * * * * * * * * EVIDENTIARY RULING
Defendants motion to consider the correspondence of plaintiff's former counsel dated October 25, 2004 is hereby ALLOWED.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on January 24, 1949 and was 55 years old on the date of hearing before the deputy commissioner. She has an extensive educational history including postgraduate courses in vocational rehabilitation from the North Carolina Department of Human Resources. She earned a Bachelor's Degree from Shaw University in 1970 and a Masters of Education from Winthrop University in 1976.
2. Plaintiff's pre-injury employment history includes work as a substitute teacher at a middle school. She spent approximately 14 years teaching. Plaintiff also worked as a manager in a local social service agency called Experience in Self-Reliance. As a supervisor, plaintiff was responsible for other case managers.
3. Additionally, plaintiff worked for employer-defendant at Centerpoint Human Services. Her job title was Clinician Level III, and in this position, she worked with families of juvenile delinquents in performing case management services. She often was responsible for transporting these juvenile delinquents in her company car and offered counseling services to them.
4. Plaintiff was injured while working with employer-defendant in May 2001, but she could not remember the exact date of injury. On the date of injury, she was meeting with a realtor and was walking down an incline. Plaintiff's legs shifted beneath her, and she fell to the left. Plaintiff thought she sprained her ankle, but took her client home and then returned to work to discuss the injury with her supervisor. Plaintiff later learned that the injury was to her low back and left leg.
5. Plaintiff received medical treatment following the May 2001 injury. She was ultimately referred to Dr. O'Keefe, who has been her primary treating physician.
6. Dr. O'Keefe was stipulated as an expert witness in the field of orthopedic surgery. He first saw plaintiff on June 13, 2001 upon referral from Dr. Phillips, plaintiff's family practitioner. Plaintiff's primary complaints at that time were in the left hip and leg, although Dr. O'Keefe felt the genesis of her problems was her back. Dr. O'Keefe obtained x-rays and performed a physical examination before arriving at a diagnosis of radiculitis.
7. In 2001, plaintiff saw Dr. Spillman, but there was an incident at his office where plaintiff reportedly fell and later presented to the emergency room complaining of such a fall. Dr. Spillman emphatically denies that plaintiff fell while in his office. According to plaintiff, Dr. Spillman "punched or pushedher" and required her to do a pull-up on the floor. He allegedly yelled at her when she could not do the pull-up and kept yelling that she had not fallen. Plaintiff's testimony in this regard is not corroborated by any other testimony or written documentation, and is not deemed credible by the undersigned.
8. Following the alleged fall in Dr. Spillman's office, plaintiff reported an exacerbation of her condition. However, Dr. O'Keefe's diagnosis was essentially unchanged, and his recommendations remained physical therapy/home exercise program. Dr. O'Keefe never felt plaintiff was a surgical candidate, as her subjective complaints outweighed her objective findings.
9. Dr. O'Keefe recommended that plaintiff participate in a functional restoration program in March 2002. However, plaintiff refused to schedule the program, indicating she would call her lawyer instead.
10. Rehabilitation professional Trudy Castlebury was assigned to plaintiff's case on September 18, 2001, although no Form 25N was submitted at that time. Dr. O'Keefe recommended that a functional capacity evaluation be performed; however, plaintiff was allegedly unable to complete the examination secondary to pain. Due to plaintiff's subjective complaints being out of proportion to objective findings, Dr. O'Keefe was of the opinion that plaintiff has reached maximum medical improvement. Plaintiff retains a 3% permanent partial disability rating to her back. Plaintiff was also capable of working within the restrictions assigned by Dr. O'Keefe at the time.
11. Plaintiff returned to Dr. O'Keefe on September 23, 2003, at which time she continued to complain of back pain. Again, Dr. O'Keefe noted that plaintiff's objective findings had been "inconsistent at best." He recommended another functional capacity evaluation to see if it would affect his opinion regarding Plaintiff's work restrictions. The FCE was eventually performed, and Dr. O'Keefe reviewed the report. Nothing in the FCE report changed any of Dr. O'Keefe's opinions regarding plaintiff's medical status and/or restrictions, and Dr. O'Keefe informed plaintiff of the same. Plaintiff maintained that she was unable to do anything.
12. Dr. O'Keefe testified that he did not recall ever prescribing a wheelchair for plaintiff, despite her claim that she needed one to ambulate. He never felt that plaintiff was unable to walk, although she occasionally represented having difficulty walking. Dr. O'Keefe knew of no reason that plaintiff would have to spend the majority of her day in bed, as she claimed. He also knew of no reason she would be unable to take a shower on her own, as plaintiff indicated.
13. Plaintiff presented to Dr. Curling, her choice for an independent medical examination, on September 17, 2002. Dr. Curling indicated at that time that he was unable to make a determination regarding maximum medical improvement, but further indicated that following a review of the MRI scan, he would be able to make an addendum to the report.
14. On October 22, 2002, Dr. Curling made an addendum to his September 17, 2002 report after reviewing a lumbar MRI. Dr. Curling indicated that there was no apparent explanation for plaintiff's radicular complaints. Dr. Curling recommended consideration of a functional restoration program, and noted that he did not feel that a pain clinic referral would be appropriate, and would recommend avoidance of narcotic or other addictive medications. Dr. Curling opined that if plaintiff elected not to proceed with the functional restoration program, he had no further recommendations. Plaintiff had already been prescribed a functional restoration program, which she declined.
15. Dr. Curling indicated that in the absence of the functional restoration program, he would assign plaintiff a 3% disability rating to her back, and would consider her capable of modified work activities. In particular, Dr. Curling would limit plaintiff's activities to 15 pound maximum occasional lifting, no prolonged station, frequent changes in position as needed, and no repetitive bending or twisting.
16. Plaintiff asserts that the opinions of Dr. O'Keefe are tainted due to ex parte communication. In her brief, plaintiff identifies several dates on which she alleges ex parte
communication occurred. However, plaintiff has not offered specific references to occurrences on those dates which would allow the Industrial Commission to make a finding, with respect to each date, that ex parte communication occurred.
17. Assuming arguendo that ex parte communication occurred between Ms. Castlebury and Dr. O'Keefe, there is no evidence to show that possible ex parte communication occurred prior to December 3, 2002. On this date, Ms. Castlebury met with Dr. O'Keefe regarding plaintiff's condition. Ms. Castlebury testified that plaintiff was scheduled to have an appointment on this day, but did not attend. Plaintiff indicates that she was never informed of this appointment. As it appears that ex parte
communication may have occurred on that date, out of an abundance of caution, the undersigned hereby prophylactically exclude opinions of Dr. O'Keefe after December 3, 2002.
18. Notwithstanding the exclusion of Dr. O'Keefe's opinions after December 3, 2002, plaintiff was still capable of participating in vocational rehabilitation pursuant to the opinions of Dr. Curling.
19. Plaintiff began vocational rehabilitation with Ms. Castlebury on August 5, 2003 at the Employment Security Commission.
20. Plaintiff denied receiving a letter from Ms. Castlebury dated July 17, 2003. She also denied receiving letters on February 12, 2003, February 27, 2003 and March 4, 2003. Plaintiff stated that the address listed on such correspondence was correct, but the letters were not received.
21. Plaintiff testified that she does not have an understanding of the vocational rehabilitation process, even though she has postgraduate training in vocational rehabilitation. Plaintiff allegedly asked Ms. Castlebury if she could begin her job search at the ESC on the first day that the two ladies met, but she stated that Ms. Castlebury discouraged her from beginning the job search at that time. Plaintiff claims that she was unaware of Ms. Castlebury's vocational rehabilitation plans throughout their relationship.
22. Ms. Castlebury testified that she attempted to discuss the purpose and specifics of vocational rehabilitation with plaintiff but that plaintiff only wanted to discuss a return to her prior job. Ms. Castlebury testified that although she was aware plaintiff had completed post-graduate education, she was unaware of the degrees received or the colleges attended as plaintiff would not divulge this information to Ms. Castlebury. Ms. Castlebury testified that she was unable to form a vocational plan because she never received complete answers to the initial vocational assessment.
23. Ms. Castlebury was placed on medical leave as the result of a car accident in January 2004 and the plaintiff vocational rehabilitation file was transferred at that time.
24. Plaintiff was asked to prepare a resume for purposes of updating her professional work experience and education; however, plaintiff included a list of her physical limitations, current medications, use of a cane and other injury-related details, explaining that she did not want to "lie" to potential employers. Plaintiff finally removed this information from the resume at the request of her current vocational rehabilitation provider, Ms. Mary O'Neill, and presented it on April 29, 2004. As of this date, plaintiff came into compliance with vocational rehabilitation.
25. Prior to April 29, 2004, plaintiff was non-compliant with vocational rehabilitation efforts, and her workers' compensation benefits were rightfully suspended.
26. On October 25, 2004, plaintiff's former attorney Roderick T. McIver informed Carl Carter at Southern Rehabilitation Network, Inc. that plaintiff indicated that due to her injury and continued pain she is unable to participate in vocational rehabilitation at this time. No medical documentation has been presented by plaintiff to support this assertion. Accordingly, after October 25, 2004, plaintiff was non-compliant with vocational rehabilitation efforts, and her workers' compensation rights should be suspended until such time as plaintiff shows that he has been cooperative and compliant with vocational rehabilitation efforts.
27. At the hearing before the deputy commissioner, plaintiff requested a change of treating physician. As plaintiff's confidence in Dr. O'Keefe has been compromised due to alleged exparte communication, the undersigned find plaintiff's request for a new treating physician reasonable.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. N.C. Gen. Stat. § 97-25 states, in pertinent part: "The refusal of an employee to accept any medical, hospital, surgical or other treatment or rehabilitative procedure when ordered by the Industrial Commission shall bar said employee from further compensation until such refusal ceases, and no compensation shall at any time be paid for the period of suspension . . ."
2. Employee-plaintiff has failed to cooperate with medical and vocational rehabilitation services offered by defendants, despite an Order of the Industrial Commission. Her noncompliance is unjustified. Plaintiff ceased her refusal to cooperate as of April 29, 2004. However, October 25, 2004, plaintiff again failed to cooperate with medical and vocational rehabilitation services. N.C. Gen. Stat. § 97-25.
3. Employee-plaintiff retains a three percent (3%) permanent partial disability to her back as a result of her compensable injury. N.C. Gen. Stat. § 97-31.
4. Plaintiff is entitled to a change of treating physician to be designated by defendants. N.C. Gen. Stat. § 97-25.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. The Special Deputy Commissioner's approval of Defendants' Form 24 Application is AFFIRMED. Defendants' Form 24 is APPROVED, and Defendants are entitled to suspend Employee-Plaintiff's temporary total disability benefits effective August 22, 2003 through April 28, 2004, and from October 25, 2004 and continuing until plaintiff shows that she is compliant with vocational rehabilitation.
2. Subject to an attorney's fee approved herein, Defendants shall REINSTATE plaintiff's temporary total disability compensation at the rate of $461.36, beginning April 29, 2004, the date plaintiff's refusal to cooperate with vocational rehabilitation ceased, until October 25, 2004. Said payments are subject to a credit for overpayment of temporary total disability benefits paid by defendants after August 22, 2003. The amounts that have accrued shall be paid in one lump sum.
3. Defendants shall pay all medical expenses associated with plaintiff's compensable injury, when bills for the same have been submitted according to proper Industrial Commission procedure. Defendants shall provide plaintiff with an evaluation by a new treating physician. Defendants may also continue with vocational rehabilitation efforts, and plaintiff shall cooperate.
4. A reasonable attorney's fee of twenty-five percent (25%) of the compensation due plaintiff under Paragraph 2 of this AWARD is hereby APPROVED for plaintiff's counsel.
5. Defendants shall pay the costs.
This the 7th day of February, 2006.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER